2026 IL App (1st) 232381-U

No. 1-23-2381

First Division
June 30, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STAE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 20 C6 60057 |
| EMMANUEL CANTEBERRY, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Patrick Coughin |
| | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's convictions for aggravated battery and resisting a peace officer are affirmed where defendant voluntarily made insulting or provoking physical contact with an officer and resisted officers performing a lawful arrest. Additionally, any discovery violation by the State was not material because it did not prejudice defendant.

¶ 2    Following a bench trial, defendant Emmanuel Canteberry was sentenced to concurrent terms of 24 months of probation for convictions of aggravated battery and resisting a peace officer. The charges stemmed from an incident in which defendant struggled with police officers

responding to a call to remove him from his girlfriend's residence in the early morning hours of January 12, 2020. Defendant now appeals his convictions, arguing that (1) the State failed to prove that he committed aggravated battery where his actions were an involuntary response to being Tased, (2) the State failed to prove that he resisted an "authorized act" where the officers lacked probable cause to arrest him, and (3) the State committed a *Brady* violation by failing to disclose impeachment evidence against one of the arresting officers. For the reasons that follow, we affirm defendant's convictions.

¶ 3                                      I. BACKGROUND

¶ 4      At approximately 3:20 a.m. on January 12, 2020, Sauk Village police officers Scott Langan and Joshua Morris responded to a call from Keyanna Williams, defendant's then-girlfriend, seeking to remove defendant from her home. The officers allowed defendant to gather his belongings and then followed in their respective squad cars as Williams drove defendant a few blocks to his mother's house.

¶ 5      Once there, defendant exited the car and Williams told the officers that defendant had taken her car keys. When defendant would not return the keys, the officers attempted to arrest him. A struggle ensued, during which one of the officers used his Taser to "drive stun" defendant twice. The same officer also sustained scrapes to his hands and leg during the incident when defendant pulled him to the ground after being drive-stunned. Based on these events, defendant was charged with three counts of aggravated battery (720 ILCS 5/12-3.05(d)(4)(i)-(iii) (West 2020)) and one count of resisting a peace officer (720 ILCS 5/31-1(A-7) (West 2020).

¶ 6      The matter was initially set for trial on June 22, 2022. However, on that date the State answered not ready because one of the police officers it intended to call as a witness (presumably Officer Langan) was unavailable. On the next court date, July 27, 2022, the State advised that the

officer was on "medical leave" for an unspecified reason. The State explained that it did not know when the officer would return from leave because "when the officer becomes medical, that becomes a little bit of a gray area as far as us finding out" details. The officer was still on medical leave on September 1, 2022. The officer had returned from leave by November 9, 2022, but was unavailable to testify as scheduled on that date because he had to respond to an emergency call about a "missing juvenile."

¶ 7       Defendant's bench trial finally began on May 24, 2023. At trial, Officer Langan testified that he and Officer Morris responded to a call that there was an unwanted person at a residence in Sauk Village at approximately 3:20 a.m. on January 12, 2020. They arrived in separate marked squad cars and in full police uniform. Williams answered the door and told the officers that she wanted defendant to leave her home. The officers came inside and spoke with defendant, who stated that he would go willingly and "just wanted to get his belongings." The officers waited for defendant to gather his things and offered to drive him somewhere. However, defendant wanted a ride from Williams, not the police. Williams agreed to drive defendant to his mother's house, which was only a few blocks away, but asked Officer Langan to escort them there because "she didn't feel safe." Officers Langan and Morris both followed while Williams drove defendant to his mother's house.

¶ 8       Once they arrived, defendant got out of Williams' car and went to the front door of his mother's house. Williams also exited the car and told Officer Langan that defendant "took the car keys. He's not giving them back." Officer Langan then approached defendant at the front door and asked him to return Williams' keys. Defendant was knocking on the door and trying to unlock it with some keys. Defendant did not return the keys and stated that he wanted Williams to drive him

to the bank. Officer Langan twice told defendant that he would be arrested for theft if he did not give Williams her keys, but defendant did not comply.

¶ 9 When defendant refused to put his hands behind his back for the arrest, Officers Langan and Morris each grabbed one of his arms and attempted to handcuff him. Defendant pulled his arms forward to resist them, so the officers forced him to the ground and tried to handcuff him. However, defendant broke free and attempted to escape by climbing a nearby fence. The officers pulled him off the fence and onto the ground, where defendant "continued to wrestle" with them.

¶ 10 Officer Langan threatened to Tase defendant if he did not stop resisting and place his hands behind his back. When defendant still did not comply, Officer Langan pulled out his Taser and "drive stunned him in the back for about two seconds." Officer Langan explained that a "drive stun" means pressing the Taser against a subject as a means of "pain compliance." The pain ends when the Taser is moved away, as opposed to when a Taser's prongs are fired at a person and "stay[] inside" their body.

¶ 11 Defendant continued to resist after the first drive-stun, so Officer Langan drive-stunned defendant again while standing over him. After the second drive-stun, defendant grabbed Officer Langan's vest by the collar, told him to "stop tasing [him]," and pulled him to the ground. They "continued to struggle" on the ground for a few minutes until Officers Langan and Morris were able to handcuff defendant.

¶ 12 Officer Langan testified that he sustained scratches to his left knee, right shin, and both hands while attempting to arrest defendant. Photographs admitted into evidence show minor scrapes and scratches on the areas Officer Langan described.

¶ 13    Once defendant was in handcuffs, he was breathing heavily and refused to stand up and walk to the squad car because he was "too tired." The officers each picked defendant up by an arm and carried him to one of the squad cars while defendant dragged his feet on the ground.

¶ 14    The defense called Williams, who testified that she called the police on the night of defendant's arrest because she wanted him removed from her home.  When the police arrived, defendant gathered many of his belongings and placed them in Williams' car, including "clothes, shoes, [a] TV, [and] game systems." Williams then drove defendant a few minutes to his mother's house while the police followed. She wanted a police escort so that defendant would go to his mother's house "without conflict between himself and [her]self."

¶ 15    Upon arrival, defendant took Wiliams' keys out of the ignition because the key to his mother's house was on the same keyring. Defendant exited the car and walked to the front door of the house. Williams also got out and stood by her vehicle. When the officers asked Williams why she got out of the car, she told them that defendant "had [her] keys." However, before Williams could clarify that defendant had the keys because he needed the house key, the officers approached defendant and "immediately" grabbed him.

¶ 16    Williams "ran quickly" towards defendant and the officers because she was confused about what was happening. She acknowledged that defendant did not comply with the officers' request to return the keys, but denied hearing them ask defendant to place his hands behind his back. According to Williams, defendant did not have time to resist because the police "instantly just ***" attacked him." The officers took defendant to the ground and continued "attacking him" while he tried to tell them that he would return the keys. Williams was screaming for the officers to stop and trying to explain that defendant "had done nothing wrong." However, the officers eventually handcuffed defendant and dragged him into one of their squad cars.

¶ 17    The defense also called defendant's mother, Vanessa Canteberry. Vanessa testified she was awoken by noise outside her house around 3:20 a.m. on the night in question. She went out to the balcony and saw defendant being Tased by a police officer while on the ground next to her fence. Vanessa then locked her dog in a room and came outside. By the time she made it outside, the police were already dragging defendant into a squad car.

¶ 18    Defendant testified that he fell asleep at Williams' house on the night of his arrest and woke up around 3:20 a.m. to the sound of Officer Morris' voice. He did not understand why the police were there. Williams asked defendant to leave, and he agreed to do so once he found his earrings. After defendant found his earrings, the officers offered to drive him somewhere. Defendant stated that he wanted Williams to drive him because his things were already packed in her car.

¶ 19    When they arrived at his mother's house, defendant took Williams' keys from the ignition because his house key was on the same key ring. Defendant walked to the front door, unlocked it with his key, and opened it. Officer Morris then approached him and asked him to give Williams her keys back. Defendant replied, "okay" and started to walk back towards Williams. However, Officer Morris quickly grabbed his shoulder and again told him to return Williams' keys. Defendant explained that he was going to get his things from the car and give Williams the keys, but Officer Morris grabbed him and slung him around, ripping his clothes.

¶ 20    Officer Langan then came over and told defendant to put his hands behind his back. Defendant "kept asking" why, but Officer Langan only repeated that he should put his hands behind his back. As defendant continued to ask what he had done wrong and whether he was under arrest, Officer Morris threw him to the ground. Defendant explained that Officer Morris was "the aggressor" who did most of the physicality as compared to Officer Langan. Defendant repeatedly asked Officer Morris why he was grabbing him, but he did not answer.

¶ 21    Officer Langan then Tased defendant, and defendant asked, "why are you tasing me?" When Officer Langan Tased him again, defendant put his hands behind his back and was handcuffed. Defendant denied resisting the officers, refusing to put his hands behind his back, or touching Officer Langan at all, let alone pulling him to ground.

¶ 22    In rebuttal, Officer Morris testifed that once Williams parked at defendant's mother's house, defendant "hastily" got out of the car and "ran up to the stairs" leading to the front door. Williams also exited the car and yelled "something about the defendant had taken her car keys." Officer Langan confronted defendant as he was knocking on the front door and "fumbling with some keys trying to get in the door." Officer Langan asked defendant to return the keys multiple times, but he would not. Defendant stated that he would not return the keys and wanted Williams to drive him to the bank. Officer Langan grabbed one of defendant's arms and told him to put his hands behind his back. Officer Morris grabbed the other arm, but defendant resisted by pulling his arms forward.

¶ 23    As defendant continued to resist, the officers took him to the ground and a "scuffle" occurred. During the struggle, defendant tried to climb a fence, but Officer Morris pulled him down before he made it all the way over. Later in the struggle, Officer Langan warned defendant that he would be Tased if he did not stop resisting. Officer Langan "drive stunned" defendant with his Taser, but it did not seem to affect him. Officer Langan then drive-stunned defendant a second time, at which point defendant grabbed Officer Langan by the vest and pulled him to the ground. After more struggling, defendant was eventually handcuffed. Afterwards, the officers had to "literally drag" defendant to the squad car because he refused to stand up and was "passively resisting" by making himself dead weight.

¶ 24 After closing arguments, the trial court found defendant guilty on all four counts. In so ruling, the court opined that the testimony of Officers Langan and Morris was "largely consistent" and "frankly ma[de] sense." On the other hand, defendant and Williams' testimony was undermined by the photographic evidence of Officer Langan's injuries, "conflict[ed] at several points[,] and frankly d[id]n't make much sense." The court also stated that the officers had probable cause to believe defendant had stolen Williams' keys and thus were "authorized in performing a lawful arrest."

¶ 25 Defendant next filed a motion for a new trial. At the hearing on the motion, the defense argued, for the first time, that defendant did not commit aggravated battery because he pulled Officer Langan to the ground as "an involuntary action or reflex" from being Tased. The court rejected that argument, stating that pulling Officer Langan down was consistent with defendant's resistance of the officers both before and after being drive-stunned. While noting that a defendant need not present evidence or prove his innocence, the court also observed that defendant did not mention anything about making involuntary movements in his testimony. Thus, the court found that "defendant's actions with regards to committing the aggravated battery were voluntary" and denied the motion for a new trial.

¶ 26 Following a sentencing hearing, the trial court merged the counts of aggravated battery and sentenced defendant to concurrent terms of 24 months of probation for aggravated battery and resisting a peace officer, respectively. This appeal followed.

II. ANALYSIS

¶ 27 A. Aggravated Battery

¶ 28 On appeal, we first address defendant's argument that the State failed to prove him guilty of aggravated battery beyond a reasonable doubt.

¶ 29    When a defendant challenges the sufficiency of the evidence, a reviewing court's task is to determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Johnson*, 2026 IL 131337, ¶ 59. We will not retry the defendant, or substitute our own judgment for that of the trier of fact on issues involving witness credibility or the weight assigned to the evidence. *Id.* Additionally, we must draw all reasonable inferences from the evidence in the State's favor. *People v. Jones* 2023 IL 127810, ¶ 28. Under this standard, we will reverse a conviction for lack of evidence only if the evidence is "so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.*

¶ 30    To sustain a conviction for aggravated battery as charged here, the State was required to prove that defendant (1) committed a battery (2) against a peace officer (3) while the officer was performing his official duties. 720 ILCS 5/12-3.05(d)(4)(i) (West 2020). A defendant commits "battery" where he knowingly and without legal justification causes bodily harm to an individual or otherwise makes physical contact of an insulting or provoking nature with an individual. *Id.* § 12-3(a). Additionally, the State must prove that defendant performed the prohibited act or acts voluntarily. 720 ILCS 5/4-1 (West 2020) ("A material element of every offense is a voluntary act[.]"); see also *People v. Grant*, 71 Ill. 2d. 551, 558 (1978) (recognizing the "fundamental principle that a person is not criminally responsible for an involuntary act").

¶ 31    In this case, defendant argues that the State failed to prove he acted voluntarily. Specifically, he contends that his act of grabbing Officer Langan's vest and pulling him to the ground was "an involuntary reaction to the painful stimuli of the taser." Initially, we point out that defendant does not seem to distinguish between being Tased, *i.e.* struck with the probes of a Taser, and drive-stunned, where a Taser's electrodes are pressed into a subject and then withdrawn. While

we agree that both can be extremely painful, they affect the body in different ways. As the Seventh Circuit has observed, the high-voltage current sent through the probes of a Taser overrides the target's central nervous system and takes control of the skeletal muscles, whereas a probe-less drive-stun "does not override the target's central nervous system." *Abbott v. Sangamon County, Illinois*, 705 F. 3d 706, 725 (7th Cir. 2013). As Officer Langan testified, a drive-stun is a means of "pain compliance," rather than a likely cause of involuntary movement. *Id.* at 726

¶ 32    Regardless, nothing about the circumstances of this case suggests that defendant pulling Officer Langan to the ground was involuntary. The evidence showed that defendant resisted the officers both before and after being drive-stunned, even going so far as to attempt to climb a fence to escape. Defendant was also apparently unfazed by the first drive-stun, as he continued to resist arrest. Moreover, the fact that defendant told Officer Langan to "stop tasing [him]" and grabbed him by vest after being drive-stunned the second time strongly suggests that his conduct was completely voluntary. Additionally, although we are mindful that defendant need not prove his innocence, we find it notable that defendant did not mention involuntary movements in his testimony and instead claimed that he never touched Officer Langan at all. Under these circumstances, it was completely reasonable for the trial court to conclude that defendant acted voluntarily. Defendant's suggestion that he did not is pure speculation, and the trial court was "not required *** to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Galarza*, 2023 IL App 127678, ¶ 25.

¶ 33    We also note that the cases on which defendant relies are readily distinguishable from the matter at hand. First, in *People v. Martino*, 2012 IL App (2d) 101244, ¶¶ 6, 15, the Second District reversed a conviction for aggravated domestic battery where the victim was injured because the defendant was Tased and fell backward on top of her. In this case, defendant was not Tased *per*

*se*, but drive-stunned. More importantly, it is one thing to conclude that a defendant involuntarily fell backward, but quite another to find that a defendant involuntarily grabbed an over-200-pound officer and pulled with enough force to bring him to the ground. Second, in *People v. Jackson*, 2017 IL App (1st) 142879, ¶ 27, the evidence established that, both before and long after being drive-stunned 10 times, the defendant was acting extremely irrationally as a result of either substance abuse or some kind of mental health crisis. Thus, the court's finding that the defendant lacked the requisite mental state for battery was *not* because of an involuntary reaction to being drive-stunned, but a consequence of his failure to grasp the nature of reality for mental reasons. *Id.* As such, *Jackson* has no bearing on this case.

¶ 34    We also note that defendant seems to suggest that, even if his conduct was voluntary, it did not constitute battery because it was not of an insulting or provoking nature. Defendant is correct that the focus is on whether his actions would be objectively insulting or provoking to a reasonable person, not whether Officer Langan subjectively felt insulted or provoked. *People v. Davidson*, 2023 IL 127538, ¶ 16. Essentially, defendant's argument is that grabbing Officer Langan and pulling him to the ground is not objectively insulting or provoking given that defendant was just drive-stunned while being arrested for no wrongdoing.

¶ 35    It is hard to understand this position. Regardless of whether defendant felt that the arrest was justified, he was not entitled to pull a police officer to the ground in an attempt to resist arrest. See 720 ILCS 5/7-7 (West 2020) (a person may not forcibly resist an arrest even if he believes the arrest is unlawful, or even if the arrest is in fact unlawful). The trial court's conclusion that defendant made insulting or provoking contact with Officer Langan was far from arbitrary or unreasonable. Thus, we affirm defendant's conviction for aggravated battery.

¶ 36                    B. Resisting a Peace Officer

¶ 37 Next, defendant argues that we should reverse his conviction for resisting a peace officer because, as the police lacked probable cause to arrest him for theft of Williams' keys or any other reason, Officer Langan was not performing an "authorized act" at the time defendant resisted him.

¶ 38 As relevant here, a person commits the offense of resisting a peace officer when he "knowingly resists or obstructs the performance by one known to the person to be a peace officer *** of any authorized act within his or her official capacity[.]" 720 ILCS 5/31-1(a)(1) (West 2020).

¶ 39 In this case, defendant contends that he was arrested without probable cause, and thus Officer Langan was not performing an "authorized act" at the time he resisted him. However, we again observe that "[a] person is not authorized to use force to resist an arrest which he knows is being made *** by a peace officer *** even if he believes that the arrest is unlawful and the arrest is in fact unlawful." *Id.* §7-7. As such, our supreme court has held that even an unlawful arrest by a peace officer qualifies as an "authorized act" within the meaning of section 31-1. *City of Champaign v. Torres*, 214 Ill. 2d 234, 242 (2005); see also *People v. Jones*, 2015 IL App (2d) 130387, ¶ 11 ("Where the authorized act is an arrest, the inquiry usually ends because a defendant is not privileged to resist even an unlawful arrest."). It is undisputed that Officer Langan was arresting defendant at the time of his resistance. Thus, his argument fails.

¶ 40 Although we could stop there, we also observe that Officer Langan *did* have probable cause to arrest defendant. Whether an arrest is supported by probable cause is an objective inquiry that depends on whether the facts known to the officer at the time of the arrest would lead a reasonable person to believe that the arrestee committed a crime. *People v. Rich*, 2025 IL App (1st) 230818, ¶ 31.

¶ 41 In this case, the officers responded to a call to remove defendant from his girlfriend's house at 3:20 a.m. Although defendant left willingly once the police arrived, he declined a ride with them

and insisted on riding with Williams. Williams only agreed to drive defendant if the police followed them because she "didn't feel safe" and thought there would be a conflict without the police there. Upon arrival at their destination, he immediately took Williams' keys from the ignition and made a hurried attempt to enter his mother's house. At this time, Williams also exited her car and told the officers that defendant had taken her keys. When confronted, defendant continued to attempt entry into the house and, according to the testimony credited by the trial court, repeatedly refused to return the keys. Under these circumstances, a reasonable person would of course suspect that defendant was committing a crime. Thus, probable cause existed. Accordingly, we affirm defendant's conviction for resisting a peace officer.

¶ 42                                    C. *Brady* Violation

¶ 43    Finally, defendant argues this court should reverse his convictions and remand for a new trial based on the State's failure to disclose impeachment evidence that Officer Langan accidentally shot an unarmed minor suspect in an unrelated case during the pendency of his trial. Alternatively, defendant asks us to remand the matter so that the trial court may consider the merits of his claim.

¶ 44    In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that a criminal defendant's constitutional right to due process requires the prosecution to disclose certain exculpatory evidence to the defense. Under *Brady*, "the prosecution must disclose evidence that is favorable to the accused and 'material either to guilt or punishment.' " *People v. Harris*, 206 Ill. 2d 293, 298 (2002) (quoting *Brady*, 373 U.S. at 87); see also Ill. S. Ct. R. 412 (eff. Mar. 1, 2001) (codifying *Brady*).  In some circumstances, impeachment evidence may be material to guilt and thus required to be disclosed under *Brady*. *Harris*, 206 Ill. 2d at 298.

¶ 45    Here, defendant argues that the State committed a *Brady* violation by failing to disclose that Officer Langan shot an unarmed juvenile suspect in an unrelated case in March 2022. In particular, defendant relies solely on an article and accompanying eight-minute video about the incident from a CBS 2 Investigates news report. See Dave Savini and Michele Youngerman, "Body camera video shows Chicago area police shooting unarmed teen," https://www.cbsnews.com/chicago/news/sauk-village-police-shooting-body-camera-unarmed-14-year-old-boy (last visited June 27, 2026). According to the video, Officer Langan and another officer approached two teenaged suspects and ordered them to put their hands behind their backs because they were under arrest for criminal damage to property. The other officer drive-stunned one of the teens, a 14-year-old boy, as he resisted arrest. The boy then broke away from the officers and ran, at which point Officer Langan drew his gun and shot the boy in the hip. According to the video, Officer Langan later told investigators that he mistook his gun for his Taser. The video indicates that the boy's lawyer had filed a civil lawsuit, but that Officer Langan was not disciplined by the police department or criminally charged.

¶ 46    The parties in this case argue at length as to whether the news report is an appropriate subject for judicial notice and whether we may consider it because it was not raised below and thus outside the record on appeal. However, we need not resolve either of those issues to dispose of defendant's claim.

¶ 47    To establish a successful *Brady* claim, a defendant must show that (1) the evidence was undisclosed by the State either willingly or inadvertently, (2) the undisclosed evidence was favorable to the defendant because it was either exculpatory or impeaching, and (3) the defendant was prejudiced because the evidence was material to guilt or punishment. *People v. Montanez*, 2023 IL 128740, ¶ 82.

¶ 48    As to the first element, the State contends that evidence of the March 2022 shooting was not "withheld" because there is no reason to believe that the prosecution was aware of the shooting prior to defendant's trial. However, as defendant observes, this is beside the point. For purposes of a *Brady* claim, the defendant need only show that the evidence was undisclosed "either willfully *or inadvertently*." (Emphasis added.) *Id.* (quoting *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008)). We do note, however, that defendant does not allege that the State willfully suppressed evidence of the shooting. We agree that there is no evidence that the prosecutors were untruthful when they told the court that they were unable to find out the details of Officer Langan's "medical leave." Still, "[t]o comply with *Brady*, the prosecutor has a duty to learn of favorable evidence known to other government actors, including the police." *Beaman*, 229 Ill. 2d at 73. It is undisputed that the shooting was known to the police at the time of defendant's trial, but, for whatever reason, not disclosed to the defense. Thus, defendant has satisfied the first element of his *Brady* claim.

¶ 49    The second element of a *Brady* claim requires the undisclosed evidence to be favorable to the defense, whether as probative of the defendant's guilt or as impeachment evidence. Defendant contends that the shooting was valuable impeachment evidence against Officer Langan, whose credibility was central to the State's case. It is true that evidence of police misconduct can sometimes be used to impeach the credibility of the officer involved. *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 66. "However, to be admissible, the evidence must not be too remote or uncertain, and must raise an inference that the witness had something to gain or lose by his testimony." *Id.* Thus, "[m]ere evidence of a civil suit against an officer charging some breach of duty unrelated to the defendant's case it not admissible to impeach the officer." *People v. Coleman*, 206 Ill. 2d 261, 279 (2002). Similarly, "[m]ere allegations of misconduct, without evidence the

officer was disciplined, are not admissible as impeachment *** and do not raise an inference of bias or motive to testify falsely." *People v. Porter-Boens*, 2013 IL App (1st) 111074, ¶ 20.

¶ 50    As summarized above, defendant's evidence demonstrates that the shooting was the subject of a civil suit, but that Officer Langan was not disciplined or charged for the incident. Indeed, the record establishes that Officer Langan had returned to active duty by the time he testified in this case. Thus, evidence of the shooting was likely inadmissible to impeach him at defendant's trial.

¶ 51    In any event, defendant cannot show the third element of a *Brady* claim, that he was prejudiced because the undisclosed evidence was material. Evidence is "material" under *Brady* where there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. *Montanez*, 2023 IL 128740, ¶ 82. The key inquiry is whether the favorable evidence could reasonably put the whole case in such a new light that it undermines confidence in the result. *Harris*, 206 Ill. 2d at 317.

¶ 52    Here, the impeachment evidence would not have had a reasonable probability of changing the outcome. Although we agree with defendant that Officer Langan's credibility was important to this case, the evidence against defendant would remain strong even if the trial court was made aware that Officer Langan was involved in a shooting for which he was not disciplined or charged years after defendant's arrest. Not only was Officer Langan's testimony supported by the physical evidence of his injuries, his testimony was virtually identical to that of Officer Morris, who the trial court also found credible. Defendant does not raise any impeachment evidence against Officer Morris. Moreover, impeaching Officer Langan with an unrelated case would have done nothing to change the fact that, in the trial court's words, the defense's version of events "conflict[ed] at several points[,] and frankly d[id]n't make much sense." On this point, defendant suggests that, had he been able to impeach Officer Langan, he might have raised a claim of self-defense.

However, we note that a defendant raising self-defense against an arresting police officer must prove, among other things, that the arrest and use of force was unlawful. *People v. Vesey*, 2026 IL 130919, ¶ 47. For the reasons previously explained, Officer Morris' testimony easily establishes that defendant resisted a lawful arrest supported by probable cause. Thus, while we do not condone the State's failure to disclose Officer Langan's involvement in the 2022 shooting, defendant's *Brady* claim fails.

¶ 53                                    III. CONCLUSION

¶ 54    For the reasons stated, we affirm the judgment of the circuit court.

¶ 55    Affirmed.